# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ROBERT J. DIETRICH,

       Petitioner,

    v.                               Case No. 11-C-117

JUDY SMITH,

       Respondent.

## DECISION AND ORDER ON HABEAS CORPUS PETITION

## I. PROCEDURAL BACKGROUND

On January 28, 2011, the petitioner, Robert J. Dietrich ("Dietrich"), filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The case was randomly assigned to United States District Judge Rudolph T. Randa. On February 3, 2011, Judge Randa issued an order under Rule 4 of the Rules Governing Section 2254 Cases, finding that the respondent should be required to file an answer to the petition. In that same order, Judge Randa set forth a schedule for the filing of the answer and the parties' respective briefs on the issues raised in the petition. Thereafter, on March 3, 2011, the case was reassigned to this court based on the parties' consent to magistrate judge jurisdiction.

According to the petition and the other documents on file, on April 23, 2007, Dietrich pled guilty to one count of first-degree sexual assault of a child in violation of Wis. Stat. § 948.02(1)(b), in the Milwaukee County Circuit Court. On June 25, 2007, he was sentenced to serve twenty years' imprisonment, consisting of thirteen years' initial confinement and seven years' extended supervision.

Prior to his guilty plea, Dietrich moved to suppress his confession, claiming that the police had obtained it in violation of his Fifth Amendment right to counsel because the police did not honor his requests for an attorney during the interrogation. The circuit court denied his motion to suppress.

Also, prior to his guilty plea, Dietrich sought a pre-trial *in camera* review of victim B.T.'s mental health records. Dietrich argued that the records would support his defense that B.T. was fabricating the assaults to deflect police attention away from an unrelated sexual incident with her boyfriend and onto Dietrich by showing that B.T. never reported the assaults to her therapist. The trial court denied Dietrich's request.

After Dietrich accepted a plea bargain and pled guilty to one count of first-degree sexual assault of a child, the State called B.T.'s therapist (Mary Determan) at Dietrich's sentencing to give her opinion on how Dietrich's assaults had affected B.T. Dietrich objected to Determan's testifying, arguing that it was unfair to allow Determan to testify when he had been denied access to the counseling records. The trial court overruled the objection. However, Dietrich submitted a sentencing memorandum from a social worker named Vicky Padway that gave alternative explanations for B.T.'s mental health problems.

Dietrich sought postconviction relief pursuant to Wis. Stat. §§ 809.30 and 974.02, seeking discovery of B.T.'s mental health records, arguing that the trial court had violated due process by relying on Determan's comments at sentencing, which Dietrich claimed inaccurately placed the blame for B.T.'s mental health problems on the assaults. Dietrich also complained that by not allowing him access to the records, the trial court denied him a chance to rebut Determan's conclusions. The trial court denied the motion, concluding that Determan's comments were merely her opinions, not facts. The trial court also concluded that Dietrich had suffered no prejudice because the court did not rely on Determan's comments when crafting Dietrich's sentence.

Dietrich appealed and, on July 14, 2009, the Wisconsin Court of Appeals affirmed his judgment of conviction and the trial court's rulings. On November 3, 2009, the Wisconsin Supreme Court denied Dietrich's petition for review.

As previously stated, on January 28, 2011, Dietrich filed his petition for a writ of habeas corpus. The briefing on the petitioner's claims has now been completed and his habeas claims are now ready for resolution. For the reasons that follow, Dietrich's petition will be denied.

## II. FACTUAL BACKGROUND AND STATE COURT DECISIONS

The court of appeals' decision sets forth the factual background giving rise to the petitioner's claims to be as follows:

> Dietrich was charged with one count of repeatedly sexually assaulting a child and two counts of intimidating a child victim after B.T. told the police in July of 2006 that Dietrich, a family friend, had sexually assaulted her several times between June 1, 2004, and August 22, 2004, when she was twelve years old. Dietrich confessed to the police that he had engaged in one sexual act with B.T. According to the complaint, after Dietrich confessed, he wrote an apology letter to B.T., and a letter to the district attorney's office saying that he was sorry and willing to get counseling.

> In a pretrial motion, Dietrich sought an *in camera* review of B.T.'s mental health records regarding an April of 2006 suicide attempt. His theory of defense was that B.T. fabricated the assaults to "deflect" police attention away from an unrelated incident with her boyfriend and onto Dietrich. He claimed that B.T.'s mental health records were material to his defense because they would show that B.T. had not mentioned during therapy the sexual assaults by Dietrich. In support, Dietrich attached to the motion a St. Francis Police Department report that recounted that B.T. told the police that she had attempted suicide because her friends at school were being mean to her and had accused her of making a bomb threat. He claimed that the police report supported his defense because "the failure to mention an event under circumstances where it would be natural to mention it is very relevant to whether the claim was recently fabricated."

> The circuit court denied the motion, concluding that Dietrich had not met his burden under *State v. Green*, 2002 WI 68, ¶ 34, 253 Wis. 2d 356, 381, 646 N.W.2d 298, 310, to demonstrate a reasonable likelihood that B.T.'s mental health records contained relevant information necessary to a determination of his guilt or innocence. *See also State v. Shiffra*, 175 Wis. 2d 600, 608-610, 499 N.W.2d 719, 723 (Ct. App. 1993).

Dietrich also sought to suppress his confession, claiming that the police violated his Fifth Amendment right to counsel. *See **Miranda v. Arizona***, 384 U.S. 436, 444 (1966). The circuit court held an evidentiary hearing on Dietrich's motion. Milwaukee Police Detective Victor Wong testified that in July of 2006, he and Detective Justin Carloni interviewed Dietrich about the assaults. According to Wong, after he went through a personal-information form with Dietrich, he read to Dietrich his ***Miranda*** rights, including the right to consult with a lawyer. Wong testified that Dietrich told him that he understood and would waive his rights. According to Wong, Dietrich did not ask to talk to a lawyer at any point in the interview.

Wong testified that he did not audio or video record the interview because at the time of the interview it was not required by department policy. According to Wong, Dietrich did not ask to make any telephone calls before the interview, and it was not department policy to allow defendants to make telephone calls "to family members" before questioning.

On cross-examination, Wong told the circuit court that while he would sometimes write in a defendant's statement that the defendant had agreed to talk to the detectives without a lawyer, he did not do so in this case:

> Q So that's your handwriting on the so-called statement. Right?
>
> A Yes.
>
> Q Was it you who decided what got written down?
>
> A Yes.
>
> Q So you decided if it's important, write it down. If you didn't think it was important, you didn't write it down. Right?
>
> A That's correct.
>
> Q And we've already established - - well, if something is not written down, it probably either didn't happen or it's not important. Right?
>
> A That could be, yes.
>
> Q And no where [*sic*] in your statement did you write that Mr. Dietrich asked for an attorney. Right?
>
> A That's correct.
>
> Q That's the sole reason for testifying he didn't ask for a lawyer?
>
> A Yes.

Q Okay. But you also didn't write down that he waived his right to an attorney. Did you?

A That is correct. I did not write that down.

On redirect-examination, Wong testified that if a defendant asked for a lawyer during an interview, he would write that down and stop the interview.

Dietrich testified that he was a Milwaukee County sheriff's deputy when he was arrested. He told the circuit court that as a sheriff's deputy he was aware of his *Miranda* rights, including the right to a lawyer. According to Dietrich, Wong read his *Miranda* rights to him at the beginning of the interview and Dietrich "didn't say anything at that time." Dietrich testified that when Wong asked him how many times he had sex with B.T., Dietrich became "very offended" and asked "to speak to an attorney." Dietrich told the circuit court that he asked to talk to a lawyer four times during the interview and that each time the detectives ignored him. He testified that he assumed his requests for a lawyer were being recorded because he saw a sign on the wall which stated "video recording in progress."

Dietrich testified that he falsely confessed because he "just needed that interrogation to be over." He told the circuit court that he signed his name "in a few places" on the statement and Wong "snatched the paper from me." Dietrich admitted on cross-examination that after he confessed to Wong he wrote the letters to B.T.'s family and to the district attorney's office.

According to Dietrich, when the interview was over, he called his father and told him that he had asked for lawyer, but was refused. Dietrich was then taken to the Milwaukee County Jail, where he spoke with a representative for the deputy sheriff's union, David Hutchins. Dietrich testified that he told Hutchins that he had asked for a lawyer several times but "they wouldn't give one to me." According to Dietrich, the next morning a St. Francis police detective asked him if he wanted to make a statement. Dietrich testified that he asked for a lawyer and the detective left.

Dietrich's father testified at the suppression hearing that Dietrich called the night he was arrested and told him "they wouldn't let me go until I told them what I did." When asked by Dietrich's lawyer, Dietrich's father said that Dietrich told him the detectives "wouldn't let him make a phone call, wouldn't let him call an attorney":

Q Did Rob [Dietrich] ever say to you that he had asked for a lawyer, and they wouldn't let him have a lawyer?

A Yes.

Q What did he say?

5

A Well, he said he asked for a lawyer, and they wouldn't let him make a phone call, wouldn't let him call an attorney.

Hutchins testified that on the night of the arrest, Dietrich told him "they didn't let me make any phone calls." Hutchins told the circuit court he "assumed that to mean that he wasn't able to contact his family and/or lawyer." Hutchins did not, however, recall Dietrich ever telling him that the detectives would not let him talk to a lawyer.

In rebuttal, Carloni testified that Dietrich did not ask to speak to a lawyer at any time during the interview. He told the circuit court that if Dietrich had asked for a lawyer, the detectives "would have ceased the interview immediately."

(Ct. App. Dec. ¶¶ 2 - 13.)

The circuit court denied Dietrich's motion to suppress, finding that Dietrich was informed of and waived his *Miranda* rights. Subsequently, Dietrich entered into a plea bargain under the terms of which he entered a plea of guilty to one count of first-degree sexual assault of a child. Subsequent to his sentencing,

Dietrich filed a postconviction motion seeking discovery of B.T.'s mental health records. He claimed that his due-process rights had been violated because the circuit court relied on "apparently inaccurate information [from Determan] concerning B[.T.]'s mental condition." The circuit court denied the motion, concluding that Dietrich had not met his burden to show that he had been sentenced based on inaccurate information. *See* ***State v. Tiepelman***, 2006 WI 66, ¶ 26, 291 Wis. 2d 179, 192-193, 717 N.W.2d 1, 7. (defendant claiming sentencing court relied on inaccurate information must show information was inaccurate and sentencing court actually relied on inaccurate information).

(Ct. App. Dec. ¶ 18.)

The Wisconsin Court of Appeals affirmed the judgment of conviction and the trial court's denial of Dietrich's postconviction motion. In upholding the trial court's denial of Dietrich's motion to suppress the court of appeals found that "[t]he circuit court's findings that Dietrich was informed of, understood, and waived his *Miranda* rights, including his right to consult with a lawyer, are not clearly erroneous. . . . Accordingly, it properly denied Dietrich's motion to suppress his confession."

(Ct. App. Dec. ¶ 24; internal citations omitted.)

As for the trial court's decision to allow Determan to speak at the sentencing hearing, the court of appeals found that

> [c]ontrary to Dietrich's assertion, he was on notice that Determan would address the circuit court at sentencing. The presentence investigation report noted that B.T.'s therapist planned on speaking at Dietrich's sentencing. Significantly, Dietrich's lawyer told the circuit court at the sentencing hearing that both he and Dietrich had reviewed the presentence investigation report. Moreover, Dietrich was permitted to, and actually did, present information that B.T.'s psychological problems were caused by things other than the assaults. The sentencing memorandum from Padway described many problems B.T. had before the assaults, including that: B.T. had problems in school and did not have any "real friends"; B.T. felt rejected by her biological father; B.T.'s mother could be "cruel and ruthless"; and B.T.'s mother's boyfriend physically abused B.T. In sum, Dietrich's due-process rights were not violated at sentencing.

(Ct. App. Dec. ¶ 27.)

As for the trial court's decision to deny Dietrich access to B.T.'s mental health records, the court of appeals stated:

> In a related claim, Dietrich contends that the circuit court violated his due-process rights when it denied his postconviction motion seeking discovery of B.T.'s mental health records. He claims that the records are material to his sentence because they "probably" contain information showing the "true *cause* of B[.T.]'s emotional problems." (Italics in original.) *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (due-process right to disclosure of favorable evidence material to guilt or punishment). Again, we disagree.
>
> The postconviction discovery of mental health records is governed by *State v. Robinson*, 2003 WI App 84, 263 Wis. 349, 661 N.W.2d 105. *See id.*, 2003 WI App 84, ¶ 22, 263 Wis. 2d at 362, 661 N.W.2d at 111 ("defendant requesting confidential records during postconviction discovery should be required to meet the preliminary *Shiffra-Green* burden"). Under *Robertson*,
>
>> a defendant must set forth a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information that is necessary to a determination of guilt or innocence and not merely cumulative to evidence already available to the defendant. Mere speculation or conjecture as to what information is in the records is not sufficient. The *Shiffra-Green* test essentially requires the court to look at the existing evidence in light of the request for an in camera review and to determine "whether the records

will likely contain evidence that is independently probative to the defense."

***Robertson***, 2003 WI App 84, ¶ 26, 263 Wis. 2d at 365, 661 N.W.2d at 113 (citations and quoted source omitted). Whether a defendant made a preliminary showing sufficient for an *in camera* review is a question of law that we review *de novo*. ***Id.***, 2003 WI App 84, ¶ 24, 263 Wis. 2d at 364, 661 N.W.2d at 112.

In his postconviction motion, Dietrich claimed that he was entitled to the discovery of B.T.'s mental health records because:

> [T]here is substantial reason to believe that many of B[.T.]'s emotional problems were entirely unrelated to Dietrich. It is a virtual certainty that B[.T.]'s extensive health-care records from only two months before contain no mention of Dietrich having sex with her. Doctors are mandatory reporters of claims by children that they have been sexually assault[ed]. In the case of B[.T.], no such disclosure was reported by a doctor. Moreover, when the St. Francis police interviewed her in April, 2006, concerning attempts to harm herself she made no mention of being sexually assaulted by Dietrich. Instead, she told police she was depressed about the fact that her friends at school thought she had been involved in a bomb threat.

Dietrich did not provide a sufficient factual basis for an *in camera* review of B.T.'s mental health records. His claim that the records would show that the cause of B.T.'s psychological problems was "entirely unrelated" to the assaults is pure speculation. The mere fact that B.T. may not have reported the assaults to doctors or the police after her April of 2006 suicide attempt does not show that her problems were solely caused by things other than the assaults. *See* ***Green***, 2002 WI 68, ¶ 37, 253 Wis. 2d at 382-383, 646 N.W.2d at 310-311 (mere assertion that counseling records may contain statements inconsistent with other reports insufficient to compel *in camera* review). Moreover, Dietrich did not show that B.T.'s mental health records contained non-cumulative information. As we have seen, Dietrich attached to his pretrial motion for an *in camera* review of B.T.'s records a report by the St. Francis Police Department that asserted that B.T. attempted suicide because her friends at school were being mean to her and accused her of making a bomb threat. Additionally, Padway's sentencing memorandum gave several alternate explanations for B.T.'s psychological problems. The circuit court did not violate Dietrich's due-process rights when it denied Dietrich's postconviction request for B.T.'s mental health records.

(Ct. App. Dec. ¶¶ 28-30.)

## IV. LEGAL STANDARDS

Federal courts may issue a writ of habeas corpus if a petitioner demonstrates that he is "in [state] custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Moffat v. Gilmore*, 113 F.3d 698, 702 (7th Cir. 1997); *see also Del Vecchio v. Ill. Dept. of Corr.*, 31 F.3d 1363, 1370 (7th Cir. 1994) (*en banc*) ("[F]ederal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law.").

The federal courts may not grant habeas relief under Section 2254 unless the state court's judgment "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "A rule is 'clearly established' only if it is compelled by existing Supreme Court precedent." *Henry v. Page*, 223 F.3d 477, 480 (7th Cir. 2000) (citing *Hogan v. Hanks*, 97 F.3d 189, 192 (7th Cir. 1996)). A state court decision results in an "unreasonable application" of clearly established federal law when that court either (1) "identifies the correct governing legal rule from [Supreme Court precedent] but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see also Harris v. Cotton*, 365 F.3d 552, 555 (7th Cir. 2004). Issues of fact found by a state court are presumed to be correct unless the petitioner rebuts this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Williams v. Parke*, 133 F.3d 971, 973 (7th Cir. 1997).

## V. DISCUSSION

*A. The Motion to Suppress*

To reiterate, the federal courts may not grant habeas relief under Section 2254 unless the state court's judgment "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Moreover, Title 28 U.S.C. § 2254(e)(1) provides that:

[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Thus, unless Dietrich can demonstrate by clear and convincing evidence that the trial court's finding that he was advised of and waived his *Miranda* rights was incorrect, his habeas claim must fail.

Dietrich argues that "whether [he] properly invoked his right to counsel, is a mixed question of fact, and of constitutional law. . . . [E]ven accepting the state court's findings of fact as true, it was utterly unreasonable to find that Dietrich properly waived his right to counsel. Additionally, though, the state court's findings of fact are not based upon reasons-- rather, the findings of fact appear to be capricious, unreasonable, and tailored to reach a predetermined outcome." (Pet'r's Br. 10.)

Dietrich argues that

it is undisputed that Wong's *only* basis for testifying that Dietrich did not request an attorney is because he (Wong) did not record such a request in his written summary of the interrogation. Significantly[], he also *did not* record the fact that Dietrich affirmatively *waived* his right to counsel, either. Wong testified that he normally records *all* important events. Specifically, Wong testified that he normally records it if the defendant affirmatively waives his right to counsel; but, in this case, he made

no affirmative note that Dietrich waived his right to counsel. Remarkably, the state judge attributed this to Wong's "laid back" personality.

Even affording Wong's testimony the presumption of correctness, it is woefully inadequate to meet the state's "heavy burden" of affirmatively proving that Dietrich knowingly and voluntarily waived his right to counsel. The finding appears to be based on the detective's personal belief that, if Dietrich had asked for an attorney, he (Wong) would have recorded this fact in his notebook. Finding an affirmative waiver of the right to counsel based upon this testimony is one level worse than improperly finding waiver from the suspect's silence, or from the fact that a confession was ultimately obtained . . . it is finding an affirmative waiver based upon the detective's silence; that is, based upon the detective's failure to make a note of any request for an attorney in his notebook. The absence of such an entry might have been due to Dietrich's mere silence; but it might also be due to Wong's negligence in failing to make the note in response to Dietrich's requests. The significance of the fact that Wong did not record that Dietrich affirmatively waived his right to counsel, either, was left unexplained by the state court, except for the judge's rationalization that it was probably due to Wong's "laid back" personality.

(Pet'r's Br. 13; internal citations omitted.)

What is abundantly clear from the above is that Dietrich quite simply does not agree with the trial court's finding that Wong was to be believed when he testified that Dietrich never asked for an attorney. To be sure, Wong's testimony about his failure to record certain matters in his written summary of the investigation impacts on his credibility. But it does not render him completely incredible. That is to say, nothing presented by Dietrich demonstrates clearly and convincingly that Wong was lying about Dietrich's never asking for a lawyer. At best, Dietrich's argument is a valiant attempt to revisit the issue of Wong's credibility. But Wong's credibility has already been weighed by the trial court. A habeas petition is not the proper mechanism by which to attack the credibility of witnesses; the attack on a witness's credibility is to take place, as it was here, in the trial court.

Moreover, for all the words that Dietrich employs in his brief to attack the reasonableness of the trial court's finding that Wong was to be believed and Dietrich was not, no where in his brief does Dietrich make any mention of the testimony of Detective Justin Carloni. And significantly, as noted by the court of appeals, [i]n rebuttal, Carloni testified that Dietrich did not ask to speak to a lawyer

at any time during the interview.  He told the circuit court that if Dietrich had asked for a lawyer, the detectives 'would have ceased the interview immediately.'" (Ct. App. Dec. ¶ 13.)  In other words, Carloni corroborated Wong.

The bottom line is that Dietrich wants this court to set aside the circuit court's finding that he did not ask for a lawyer during the course of his interrogation.  But, that is not the function of a habeas court (absent his demonstrating that the trial court's determination of the facts was unreasonable, and absent his demonstrating by clear and convincing evidence that the trial court's factual determination was incorrect).  To reiterate, habeas relief can only be given if a constitutional violation occurred.  And in deciding whether a constitutional violation occurred, a habeas court cannot make new factual findings.  To the contrary, the factual findings of a state court cannot be set aside unless the presumption of their correctness is rebutted by clear and convincing evidence. Dietrich has failed to satisfy that burden of proof.

Thus, to the extent that Dietrich's habeas corpus petition is predicated on the claim that his *Miranda* rights were violated, his petition will be denied.

*B. The Mental Health Records and Due Process*

Dietrich argues that he was denied due process of law at his sentencing hearing for the following two reasons:

(1) Because the State put [B.T.'s] mental condition in issue at sentencing, and Dietrich has a due process right to have access to the evidence and to prepare to rebut the evidence; and, (2) Dietrich made a showing that the therapy records were likely to reveal evidence that would mitigate the need to punish Dietrich at sentencing.

Where evidence is relevant to either guilt or to sentencing- even if the evidence is inculpatory - the defendant has a due process right to review the evidence and to prepare to rebut the evidence.  This is a fundamental precept of due process. A defendant has a due process right to be sentenced based on accurate information. Part and parcel of this rule is that the defendant be given notice of the information that will be presented against him at sentencing and that he also be given a reasonable opportunity to rebut the information.  Thus, Dietrich has a fundamental right to

prepare his defense secure from governmental intrusion. *Weathisford v. Bursey*, 429 U.S. 545 (1977); *United States v. Kilrain*, 566 F.2d 979 (5th Cir. [1978]); *United States v. Woods*, 544 F.2d 242 (6th Cir. 1976). Governmental intrusion occurs when the government manipulatively relies upon an evidentiary privilege so as to thwart the defendant's ability to prepare his defense.

(Pet'r's Br. 14 -15.)

Once again, in order to succeed on his habeas petition, Dietrich must demonstrate that the state court's judgment "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Dietrich argues that his due process rights were violated by the trial court's reliance on the testimony of Mary Determan at sentencing, when at the same time Dietrich was denied access to B.T.'s mental health records that were maintained by Determan. He claims that Determan's records relating to B.T. would probably have shown that B.T. did not attribute her poor mental and emotional state to Dietrich's actions, but rather to other influences and experiences.

The due process clause requires that a defendant not be sentenced on inaccurate information. For example, in *United States v. Tucker*, 404 U.S. 443 (1972), *superseded by statute*, Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, the Supreme Court held that it was a violation of due process where the trial judge, in imposing sentence, gave explicit consideration to three previous felony convictions, two of which were constitutionally invalid, i.e., having been obtained in violation of the right to counsel. The Court stated:

[W]e deal here, not with a sentenced imposed in the informed discretion of a trial judge, but with a sentence founded at least in part upon misinformation of constitutional magnitude. As in *Townsend v. Burke*, 334 U.S. 736, "this prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue." *Id.*, at 741. The record in the present case makes evident that the sentencing judge gave specific consideration to the respondent's previous convictions

13

before imposing sentence upon him. Yet it is now clear that two of those convictions were wholly unconstitutional under *Gideon v. Wainwright*, 372 U.S. 335.

We need not speculate about whether the outcome of the respondent's 1938 and 1946 prosecutions would necessarily have been different if he had had the help of a lawyer. Such speculation is not only fruitless, but quite beside the point. For the real question here is not whether the results of the Florida and Louisiana proceedings might have been different if the respondent had had counsel, but whether the sentence in the 1953 federal case might have been different if the sentencing judge had known that at least two of the respondent's previous convictions had been unconstitutionally obtained.

We agree with the Court of Appeals that the answer to this question must be "yes." For if the trial judge in 1953 had been aware of the constitutional infirmity of two of the previous convictions, the factual circumstances of the respondent's background would have appeared in a dramatically different light at the sentencing proceeding. Instead of confronting a defendant who had been legally convicted of three previous felonies, the judge would then have been dealing with a man who beginning at age 17, had been unconstitutionally imprisoned for more than ten years, including five and one-half years on a chain gang. We cannot agree with the Government that a re-evaluation of the respondent's sentence by the District Court even at this late date will be either "artificial" or "unrealistic."

*Tucker*, 404 U.S. at 447-449.

First of all, Dietrich has not demonstrated that the sentencing court was provided, much less relied upon, any incorrect *factual* information at the time of sentencing. Instead, the court was provided with Determan's <u>opinion</u> about the impact Dietrich's actions had on B.T.'s mental health. To be sure, it is logical to conclude that Determan's opinion was informed by her treatment of B.T. And Dietrich argues that he cannot attack, or at least meaningfully question, Determan's opinion without viewing B.T.'s mental health treatment records to see if such records support Determan's opinion. And so the real issue here is whether Dietrich's due process rights were violated by being denied access to B.T's mental health records, or more precisely, by the trial court's not viewing the mental health records *in camera* prior to sentencing.

The only Supreme Court precedent that seems to have any application to the issue in this case, to wit, the disclosure of privileged records, is *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987). In

*Ritchie*, the Court held that due process requires that a criminal defendant have access to confidential, privileged files if, after an *in camera* review of such files, the trial court determines that "[they] contain[] information that probably would . . . change[] the outcome of [the defendant's] trial." *See Ritchie*, 480 U.S. at 58.

The Seventh Circuit Court of Appeals had occasion to discuss *Ritchie* in some detail in *Rizzo v. Smith*, 528 F.3d 501 (7th Cir. 2008).

In *Ritchie*, the defendant was charged with sexually assaulting his 13-year-old daughter. During pretrial discovery, Ritchie requested access to the counseling files maintained by a child protective agency concerning his daughter. He argued that disclosure of the files was necessary because it might aid in his defense, perhaps revealing statements his daughter made to the agency that were inconsistent with her trial statements, or show that she acted with an improper motive. The agency refused to comply with the request, claiming that the records were privileged, subject to specified exceptions.

The Supreme Court applied a Fourteenth Amendment due process analysis to Ritchie's claim and held that fundamental fairness required that he receive an *in camera* review of the records to determine whether they contained exculpatory information or information that would affect the outcome of the trial. The Court explained that, under the Fourteenth Amendment, "[i]t is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Id*. at 57. However, it reasoned that "[t]o allow full disclosure to defense counsel in this type of case would sacrifice unnecessarily the [State's] compelling interest in protecting its child-abuse information." *Id*. at 60. It concluded that an *in camera* review by the trial court balances the rights of the defendant in ensuring a fair trial and the needs of the State or the individual to keep those records private.

Although a majority of the Court found a due process violation, a plurality determined that the withholding of the confidential files did not amount to a confrontation violation. The plurality reasoned that "the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination." *Id*. at 52. Consequently, "[t]he ability to question adverse witnesses . . . does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." *Id*. at 53. Justice Blackmun in concurrence (as well as Justices Brennan and Marshall in dissent) would have found a confrontation violation, but this view was not shared by any other concurring Justice. Thus, *Ritchie* is only "clearly established" federal law supporting a Fourteenth Amendment due process claim.

As we previously discussed, in rejecting Rizzo's position, the state supreme court relied on *Shiffra*, a case where the Wisconsin Court of Appeals applied *Ritchie* in establishing procedures for an *in camera* review of a complainant's confidential records. Thus, although the supreme court did not cite directly to *Ritchie*, it did apply *Ritchie*'s constitutional standard. So the question becomes whether the state supreme court's conclusion that Rizzo was not entitled to the treatment records for Daphne simply to impeach Dr. Pucci's credibility constituted an unreasonable application of *Ritchie.*

The state supreme court's conclusion was certainly reasonable. *Ritchie* says that due process requires confidential information that is potentially exculpatory to be submitted to the trial court for an *in camera* review. That's exactly what Rizzo got. The state trial judge conducted an *in camera* review of Dr. Pucci's files and found no exculpatory information.

*Rizzo*, 528 F.3d at 505-06.

Of course, in the instant case, Dietrich did not receive an *in camera* review of B.T.'s mental health records in the first instance. And so the $64,000.00 question is: By not at least granting Dietrich an *in camera* review of B.T.'s mental health records after conviction but prior to sentencing did the state trial court violate Dietrich's due process rights as discussed in *Ritchie*? Even more to the point, was the state court of appeals' ruling in which it affirmed the trial court's decision to not even conduct an *in camera* review of B.T.'s mental health records either contrary to, or unreasonable application of, *Ritchie*?

As was observed by the Seventh Circuit in *Rizzo*, in *Ritchie* "[t]he Supreme Court applied a Fourteenth Amendment due process analysis to Ritchie's claim and held that fundamental fairness required that he receive an *in camera* review of the records to determine whether they contained exculpatory information or information that would affect the outcome of the trial. . . . *Ritchie* says that due process requires confidential information that is potentially exculpatory to be submitted to the trial court for an *in camera* review." *Id.* at 505 (emphasis added). In other words, *Ritchie* does not require that confidential information be provided merely for the purpose of cross-examining an unfavorable witness. "The ability to question adverse witnesses . . . does not include the power to

require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." *Ritchie*, 480 U.S. at 53. And that is precisely the purpose for which Dietrich sought B.T.'s mental health records. He wanted to see whether Determan's opinion of how Dietrich's assault of B.T. affected her mental condition was supported by the content of those records, i.e., what B.T. said to Determan during her therapy sessions. Simply stated, the information that he was seeking was not "exculpatory" as *Ritchie* required it to be in order for due process to require its disclosure.

Moreover, in its decision denying Dietrich's postconviction motion, the trial court had this to say about Dietrich's claim that he was denied due process at sentencing:

> The defendant argues that he was denied due process at his sentencing because the court relied upon "*apparently* inaccurate information concerning [the victim's] mental health condition" and because he was denied an opportunity to review the victim's treatment records for purposes of rebutting Ms. Determan's statements. A defendant who alleges that the court relied upon inaccurate information at sentencing has the burden of showing both that the information was inaccurate and that the court actually relied on the inaccurate information. *State v. Harris*, 174 Wis. 2d 367 (Ct. App. 1993). Once the defendant has made this preliminary showing, the burden then shifts to the State to demonstrate that the defendant was not prejudiced. *State v. Tiepelman*, 291 Wis. 2d 179 (2006). In this instance, the defendant argues that "[t]here is [sic] good reasons to believe that Determan's comments about the cause of [the victim's] mental problems were not accurate (i.e. there is reason to believe that the sexual assault is not what caused [the victim's] mental problems.)" The defendant is not challenging the accuracy of Ms. Determan's statements about her therapy sessions with the victim; he is challenging her conclusions that the victim's psychological problems and behavioral issues were *caused* by the sexual abuse by the defendant. There is no reason to believe that the treatment records would establish that Ms. Determan's professional conclusions were "inaccurate," and therefore, the court finds no basis upon which to conclude the victim would have been required to release her treatment records to the defendant for sentencing purposes. The fact that the defendant does not agree with Ms. Determan's conclusions does not make her statement inaccurate. Nor was the court obliged to exclude her comments at the sentencing hearing on the basis that the defendant was not allowed access to the victim's treatment records. Section 972.14(3)(a), Stats., authorizes the court to "allow any other person [besides the victim] to make or submit a statement" to the court at sentencing. In sum, the court finds that the defendant has not met his burden of showing that inaccurate information was presented at the sentencing hearing.

Even assuming *arguendo* that it was error to allow Ms. Determan to give her statement at sentencing without the defendant having had an opportunity to review the treatment records, the defendant was not prejudiced because the court did not base its sentencing decision on her comments. The court understood that there were two factual versions of the events in this case and that the defendant's level of culpability was at issue. On the one hand, the defendant placed a significant amount of responsibility on the victim while referencing the sexual contact during his own psychological evaluation. He indicated that the offense would not have happened had the victim not been overly affectionate, encouraging and curious about sex. He described her as a promiscuous person who initiated the sexual contact because she had a crush on him. On the other hand, the victim reported inappropriate sexual contact in various forms occurring over a two and a half year period of time, which was followed by evident self-destructive behavior and negative personality changes. The court considered both of these positions and ultimately concluded that the victim's behavior was more consistent with her claims of sexual abuse and victimization rather than the defendant's claims of sexual aggressiveness. The court was free to make this determination within the exercise of its sentencing discretion. *See **State v. Hubert***, 181 Wis. 2d 333 (Ct. App. 1993). The court appropriately considered this factor in weighing the defendant's culpability and rehabilitative needs as well as the community's interest in punishment, deterrence and protection.

(June 20, 2008 Tr. Ct. Dec. and Order 2-4; footnote omitted.)

The trial court's decision makes clear that it did not place any material weight on Determan's comments at sentencing. Thus, even assuming that the trial court should have conducted an *in camera* review of B.T.'s mental health records, it is clear that Dietrich was not prejudiced by the court's failure to do so. In other words, there was nothing in those records that would have "affect[ed] the outcome of the [sentencing]." *Rizzo*, 528 F.3d at 505. Accordingly, the state court cannot be said to have violated Dietrich's due process rights as discussed in *Ritchie*.

In the end, despite a most noble effort of the petitioner to make his case for habeas relief, I am not persuaded that the state court's judgment "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Thus, to the extent that Dietrich's habeas corpus petition is predicated on the claim that his due process rights were violated by the trial court's

not conducting an *in camera* review of B.T.'s mental health records and thereafter providing any of such records to him prior to sentencing, Dietrich's petition will be denied.

## VI. CERTIFICATE OF APPEALABILITY

There is one final matter to address. Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides, in pertinent part, as follows:

> a) Certificate of Appealability. The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue. If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2). If the court denies a certificate, the parties may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22.

Under 28 U.S.C. § 2253(c), a district court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The court of appeals has held that this standard differs only in scope from the certificate of probable cause standard that was previously developed and applied by the courts. *See Herrera v. United States*, 96 F.3d 1010, 1012 (7th Cir. 1996). The *Herrera* court said that "a certificate of probable cause places the *case* before the court of appeals, but a certificate of appealability must identify each *issue* meeting the 'substantial showing' standard." *Id*. (emphasis added). Thus, for the court to issue a certificate of appealability to Dietrich, it must identify for the court of appeals the issues that are "debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are 'adequate to deserve encouragement to proceed further.'" *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (emphasis added) (quoting *Gordon v. Willis*, 516 F. Supp. 911, 913 (N.D. Ga. 1980)). This test was reiterated in *Miller-El v. Cockrell*, 537 U.S. 322 (2003), *rev'd on other grounds, Miller-El v. Dretke*, 545 U.S. 231 (2005).

> Consistent with our prior precedent and the text of the habeas corpus statute, we reiterate that a prisoner seeking a COA need only demonstrate "a substantial showing

of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.

*Id.* at 327 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

In my opinion, jurists of reason could disagree with this court's resolution of Dietrich's due process claim, and furthermore, jurists could conclude that the due process issue that Dietrich has presented in his habeas petition is adequate to deserve encouragement to proceed further. Thus, the court will grant a certificate of appealability on the following issue: whether Dietrich's due process rights were violated by the trial court's not conducting an *in camera* review of B.T.'s mental health records and thereafter providing any of such records to Dietrich prior to sentencing.

However, for the reasons set forth in this decision denying Dietrich's habeas corpus petition, his claim that his *Miranda* rights were violated does not warrant a certificate of appealability. Put simply, the petitioner has not demonstrated "a substantial showing of the denial of a constitutional right" by demonstrating either that jurists of reason could disagree with this court's resolution of this claim or that jurists could conclude the issue presented is adequate to deserve encouragement to proceed further. Consequently, the court will deny Dietrich a certificate of appealability with respect to his *Miranda* claim. Of course, Dietrich retains the right to seek a certificate of appealability from the court of appeals on his *Miranda* claim. *See* Fed. R. App. P. 22(b).

**NOW THEREFORE IT IS ORDERED** that Dietrich's petition for a writ of habeas corpus be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that a certificate of appealability be and hereby is **GRANTED** on the following issue: whether Dietrich's due process rights were violated by the trial court's not conducting an *in camera* review of B.T.'s mental health records and thereafter providing any of such records to Dietrich prior to sentencing;

**IT IS FURTHER ORDERED** that a certificate of appealability be and hereby is **DENIED** on Dietrich's *Miranda* claim;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

**SO ORDERED** this <u>23rd</u> day of February 2012 at Milwaukee, Wisconsin.

**BY THE COURT**:

<u>s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge